# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

MADONNA J. WALLS,
Plaintiff

vs

Case No. 1:08-cv-254-SJD-TSH
(Dlott, C. J.)
(Hogan, M. J.)

COMMISSIONER OF
SOCIAL SECURITY,
Defendant

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for Supplemental Security Income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's memorandum in opposition (Doc. 18) and plaintiff's Memorandum in Reply to the Commissioner's memorandum in opposition. (Doc. 21).

## PROCEDURAL HISTORY

Plaintiff, Madonna J. Walls, filed an application for SSI on April 25, 2003, alleging disability since December 1, 1999, due to a heliobacter, multi glandular goiter, subcutaneous vascular disease, fibromyalgia, irritable bowel syndrome, low immune system, depression, herniated disk on the neck and lower back, hypoglycemia, acid reflux disease and asthma. (Tr. 56-59, 73, 82). She was born in 1964, and was 41 years old at the time of the ALJ's decision. Plaintiff has a high school education with two years of college and past work experience as a cashier, assistant manager, assembler, cleaner, shipper, and daycare worker. Plaintiff's application was denied initially and upon reconsideration. Plaintiff requested and was granted a de novo hearing before an ALJ. On August 10, 2005, plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ Larry A. Temin.

On February 15, 2006, the ALJ issued a decision denying plaintiff's SSI application. The ALJ determined that plaintiff suffers from the following severe impairments: chronic pain

syndrome/ myofascial pain syndrome; cervical and lumbosacral spine degenerative disc disease; chronic abdominal pain, status post hysterectomy, laparoscopic cholecystectomy, umbilical hernia repair, and lysis of adhesions; asthma / restrictive airway disease / allergic rhinitis / bronchitis; dysthymia; and posttraumatic stress disorder. The ALJ concluded that these impairments do not alone, or in combination, meet or equal the level of severity described in the Listing of Impairments. (Tr. 19). According to the ALJ, plaintiff retains the residual functional capacity (RFC) for less than a full range of sedentary work:

> She can lift/carry/push/pull up to 10 pounds occasionally and up to 5 pounds frequently. She can stand and/or walk up to 2 hours per 8-hour workday. She can occasionally stoop, kneel, crouch, climb ramps/stairs, and perform work requiring the forceful use of the right and/or left upper extremity. She cannot crawl, climb ladders/ropes/scaffolds, work at unprotected heights or around hazardous machinery. The claimant should avoid concentrated exposure to fumes, noxious odors, dusts, gases, and outdoor work. The claimant is unable to remember or carry out detailed instructions.

(Tr. 20). The ALJ determined that plaintiff's allegations regarding her limitations are not totally credible. (Tr. 21). The ALJ also determined that while plaintiff is unable to perform her past relevant work (Tr. 23), she retains the capacity to perform other work that exists in significant numbers in the national economy including jobs as a shipper and receiver, hand packager, machine package filler and telemarketer. (Tr. 24). Consequently, the ALJ concluded that plaintiff is not disabled under the Act. The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## PLAINTIFF'S TESTIMONY AT THE HEARING

The ALJ fairly summarized Plaintiff's testimony at the August 10, 2005 hearing as follows:

> At the hearing, the claimant said she is sick all the time and is constantly going to the doctor for bacterial infections. She said she takes antibiotics every month. She described continuing severe pain in the right abdomen and abdominal organs, and she said her body swells to the extent she looks pregnant by the end of the day. She said this symptom had worsened since her gall bladder removal in January 2004. The claimant further testified to pain in her back radiating down both her arms and legs. She said her arms go to sleep, and her legs swell with any

2

walking due to venous insufficiency. The claimant testified she has never been to a rheumatologist, despite having reported a diagnosis of rheumatoid arthritis to Dr. Zaacks. She said she had an EMG of her arms, but there is no record of this. The claimant also testified to having shortness of breath "almost every day" of her life. She said she gets lightheaded and feels like she is going to pass out. She said in the winter of 2004 she had bronchitis 8 times, pneumonia 2 times, and the flu 3 times.

The claimant testified she takes 1500 mg of Percocet per day for fibromyalgia and herniated discs. She said she stopped taking Nexium because it caused diarrhea. The claimant said she is also using an Albuterol inhaler 2 times per day to 4 times per day. She said Albuterol causes her heart to race and sometimes gives her a headache. According to Dr. Minhas' notes, the claimant made it clear to him that she wanted only Percocet for pain (Exhibit 9F). At the hearing, she explained that she has adverse reactions to new medication. Dr. Minhas also noted the claimant would not undergo interventive procedures. The claimant explained that she does not want to suffer the side effects of such procedures.

The claimant said she has trouble lifting things. She said lifting makes her feel like her back is breaking and causes muscle spasms. She said she can lift only up to 10 pounds, per Dr. Minhas' orders, stand / walk about 30 minutes, and sit for an hour at the most. She said climbing stairs makes her lightheaded and short of breath. She said she usually spends her days watching television and occasionally cleans the house and does laundry when she has energy. The claimant said she usually buys TV dinners because she is too weak to cook. She carries light groceries from the car to her house, but her children carry heavy items. She said her boyfriend usually does her laundry, and her son takes out the garbage. Her boyfriend or children mow the lawn because she is too weak and cannot breathe by the time she is finished. The claimant testified to multiple firings because her symptoms reportedly prevented her from attending work regularly.

The claimant further testified she has been depressed and anxious since she was a child. She said she would like to go back to work and back to college, and she fears losing her children because of her illness. She said she stays away from a lot of food because of stomach pain, but she did not describe depression related appetite disturbances. The claimant also said she wakes every 2 hours due to pain but did not relate this to depression. The claimant said she has periods of being weak, and her energy is low. She said she cries almost every day, and has low self-esteem, but she has had no recent suicide attempts or suicidal ideation. She reported several suicide attempts and said she has been to the hospital many times for such; the undersigned notes that this is uncorroborated by supporting records.

The claimant further testified to panic attacks. She said she has a fear of men and

of people she does not know. She said panic attacks occur when she goes out alone, so she tries to avoid going out. She testified that in the last year she had about 15 panic attacks.

(Tr. 20-21).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's hypothetical question to the VE assumed an individual of Plaintiff's age, education, and work history who has the RFC to work involving lifting, carrying, pushing and pulling up to ten pounds occasionally and five pounds frequently; in combination stand and/or walk up to two hours in an eight-hour workday; no sitting restriction; occasional crouching, stooping, kneeling and climbing of ramps and stairs; occasional work requiring forceful use of the lower extremities; no crawling, climbing of ladders, ropes or scaffolds, work at unprotected heights or hazardous machinery; no concentrated exposure to fumes, noxious odors, dusts, gases or outdoor work. The hypothetical individual was also unable to remember or carry out detailed instructions. The VE responded that an individual with those limitations could perform a representative number of light jobs, such as shipper/receiver, hand packager, package filler/machine package filler, telemarketer and grading/sorting jobs. The VE also identified sedentary jobs the Plaintiff could perform such as bench assembler, inspector and shipper. The VE testified that his testimony was consistent with the information contained in the *Dictionary of Occupational Titles*. The VE conceded that if the hypothetical individual would miss three work days per month, competitive employment would be precluded. (Tr. 514-20).

## MEDICAL RECORD

In her Statement of Specific Errors, Plaintiff does not challenge the Commissioner's findings with respect to her alleged mental impairments. (Doc. 12). Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

X-rays of Plaintiff's cervical spine taken July 2002 revealed multifocal osteoarthritis and reversal of the cervical lordotic curve; changes were most pronounced at C6-7. (Tr. 130). X-rays

4

of her lumbosacral spine showed prominent spur formation anterior superior border of L4 and posterior apophyseal joint arthropathy in the lower lumbar region. (Tr. 131). X-rays of her right hip demonstrated a negative pelvis and right hip aside from mild hip osteoarthropathy. (Tr. 132).

An August 2002 ultrasound of Plaintiff's thyroid showed multiple thyroid nodules consistent with multinodular goiter. (Tr. 128). Plaintiff did not take her antithyroid medication. (Tr. 301).

Plaintiff was hospitalized in September 2002 for abdominal pain. Chest x-rays showed no evidence of acute cardiopulmonary disease. (Tr. 127). A CT scan of Plaintiff's abdomen demonstrated unremarkable liver, spleen, kidneys and pancreas, but Plaintiff's cervix appeared prominent. (Tr. 126). While in the hospital, Plaintiff was seen by Deborah Anne Rouse-Raines, M.D. for consultation. Plaintiff had complaints of chronic flank and abdominal pain, accompanied by hematuria, bloating, diarrhea, irregular menses, and nausea. She has also described rectal bleeding, nausea, and fevers. Dr. Raines reported plaintiff was originally referred to a gastroenterologist and a breast surgeon, but she was somewhat noncompliant. Dr. Raines noted Plaintiff's pelvic pain was initially relieved with birth control pills, but she stopped taking them. She also took herself off Celexa because she felt too flat. (Tr. 384-85).

A November 2002 NM hepatobiliary scan revealed no cystic duct obstruction and Plaintiff's gallbladder responded normally to a fatty challenge. (Tr. 124).

Treatment records from primary treating physician, Michael Holliday, M.D., begin January 2003. Dr. Holliday treated Plaintiff for a variety of ailments, including shortness of breath, asthma, pain, and headaches. The claimant has a history of recurrent respiratory infections. Her symptoms have included wheezing, productive cough with purulent sputum, shortness of breath, fevers, chest pain and pain with breathing, hemoptysis, sore throat, nasal congestion, rhinorrhea, sneezing and puffiness around the eyes. She has been diagnosed with multiple respiratory disorders, including bronchitis, asthma, sinusitis, restrictive airway disease, and allergic rhinitis. She has been treated with Albuterol, Prednisone, Advair, Augmentin, and Singulair. (Tr. 155-74, 201-268, 387).

Chest x-rays taken in May 2003, demonstrated normal heart size and clear lungs. (Tr. 120). An intravenous pyelogram was normal. (Tr. 120).

In May 2003, Plaintiff was evaluated by Phillip Zaacks, M.D. a pain specialist due to "whole body pain". She reported pain in her neck, low back, kidneys, chest, joints and organs. She related some of this pain back to a motor vehicle accident in 1997. She complained her pain interferes with her sleep, and reported spending most of her day resting or reclining, except on "good days". She stated that she is able to maintain self-care and household activities. Dr. Zaacks noted that much of the medical history she provided is not corroborated. Plaintiff reported a history of seizures, cancer, rheumatoid arthritis, depression, and blood clots, but there was no positive work up for these conditions. Examination revealed Plaintiff had good range of motion of the cervical spine and did not complain of pain with movement. Plaintiff was able to perform a heel/toe walk and a full squat independently and had good range of motion of the trunk and did not complain of any increased pain with movement. Plaintiff had muscle tenderness, but deep tendon reflexes were all normal. Straight leg raising was negative and sensation was intact. 288). Dr. Zaacks diagnosed chronic pain syndrome and myofascial pain syndrome. (Tr. 284-88). Plaintiff was scheduled for physical therapy and psychological evaluations, but she did not keep the appointments and was discharged from the practice. (Tr. 283, 288).

June 2003 chest x-rays showed no acute disease and x-rays of Plaintiff's abdomen were nondiagnostic. (Tr. 118). A CT scan of her abdomen and pelvis revealed right ovarian cysts but was otherwise normal. (Tr. 117). An upper GI and small bowel follow-through was negative. (Tr. 115-16).

In August 2003, Plaintiff had a hysterectomy for pelvic venous congestion syndrome and ovarian cysts. During the surgery, adhesions were discovered and were cut away. (Tr. 380-83).

Due to complaints of right upper quadrant pain, Dr. Holliday sent plaintiff for a hepatobiliary scan in December 2003. The results revealed no evidence of cystic duct obstruction. (Tr. 310). An ultrasound of the abdomen revealed no gross abnormality and no evidence of gallstones. (Tr. 308). Cervical spine x-rays demonstrated significant reversal of the normal cervical lordotic curvature consistent with muscle spasm; moderate diffuse narrowing of the disc spaces at the C5-6 and C6-7 levels; posterior elements were maintained; and no acute abnormalities. (Tr. 307).

Plaintiff's gallbladder was removed in January 2004 for acalculous cholecystitis. (Tr.

280-81). Plaintiff's surgeon, reported that Plaintiff did not return for a post-operative checkup, so the physician presumed Plaintiff was doing well. (Tr. 298).

Rajbir Minhas, M.D. examined Plaintiff in February 2004. Plaintiff complained her pain had worsened and was aggravated by standing, walking, lifting, bending, twisting, or doing any routine activities of daily living. She rated the pain at 7-8/10. Examination revealed plaintiff's gait was normal; heel and toe walk and single-step rise were unremarkable; and right knee reflex was normal. He indicated that there was no remarkable deformity of her cervical spine, but there was tenderness to palpation and limited range of motion. Right bicep reflex was normal and left tricep was rated at low normal, slightly diminished response; right grip strength was 12 psi (pounds per square inch) and left grip strength was 11 psi; and right lateral shoulder, dorsal first web space, tip long finger, and ulnar small finger had a decreased sensation in the right C6-8 distribution. Dr. Minhas noted that x-rays of Plaintiff's cervical spine showed degenerative disc disease with disc space narrowing, subluxation or fracture notes. Dr. Minhas diagnosed chronic pain syndrome with degenerative disc disease of the cervical spine, cervical radiculitis, fibromyalgia, and chronic pain syndrome. Dr. Minhas prescribed medication and advised Plaintiff to start doing exercises on a regular basis. (Tr. 292-97).

When Plaintiff returned to Dr. Minhas in March 2004, she reported that she was doing fairly well. She did not take all the medications which were prescribed. (Tr. 371). Dr. Minhas ordered an MRI of Plaintiff's cervical spine which revealed posterior element and soft tissue high signal behind the C6-7 level with edema along the transverse process and spinous process most likely from a hyperflexion injury, somewhat unusual; mild posterior and inferior bone contusion was noted at the C6-7 end plates on the left side, which could also be post-impaction or inflection injury or resulting extension impaction; the disc herniations were likely longstanding, but age could not be determined on an MRI; compressive disc herniations right paracentral at C5-6 and broad central left paracentral and foraminal at C6-7 effacing the ventral surface of the cord at each level respectively; and typical correlation was advised. There was no abnormal high signal within the cord to imply a definite cord contusion; no hematoma was identified in the cord; and no discrete fractures were identified. (Tr. 313-14). Dr. Minhas continued to treat Plaintiff at least through May 2005. (Tr. 355-73).

In March 2004, plaintiff reported to Dr. Holliday that she stopped taking Prednisone and Singulair because they made her "kidneys hurt". She further reported that Albuterol made her wheezing worse, but Dr. Holliday commented that "did not make sense to me." (Tr. 247-48). A May 2004 MRI of Plaintiff's lumbar spine revealed mild facet arthropathy in the lower lumbar facet joints especially at L4-5; no disc protrusion or spinal stenosis; and no other significant abnormality. (Tr. 316).

In June 2004, Susan Haynes, OWF Administrator with the Business Workforce Resource Center of Clermont County, wrote to Dr. Holliday to inform him that she was currently working with Plaintiff towards self-sufficiency and her goal was to help Plaintiff gain employment in a field that would work with her abilities. Plaintiff was at that time receiving cash assistance and was able to receive it for a total of thirty-six months, but had exhausted her thirty six months and was applying for a hardship extension. Plaintiff told Ms. Haynes that she had medical conditions that might prevent her from working and Ms. Haynes requested that Dr. Holliday complete a form stating Plaintiff's conditions and her ability to work. (Tr. 299).

In August 2004, plaintiff underwent a cystoscopy and urethral dilatation due to urethral stenosis. (Tr. 282).

Sometime after an October 12, 2004 visit with Plaintiff, Dr. Holliday completed a "Basic Medical" form, reporting Plaintiff's diagnoses as fibromyalgia, chronic pelvic pain, depression, multinodular goiter with subclinical hyper thyroid, GERD, and asthma. Dr. Holliday indicated that Plaintiff could sit for one hour without interruption for a total of two to three hours in an eight-hour day; stand/walk for one-half hour without interruption for a total of two hours in an eight-hour day; and lift eleven to twenty pounds occasionally and six to ten pounds frequently. He also reported that Plaintiff was moderately limited in her ability to handle and perform repetitive foot movements; markedly limited in her ability to push/pull; and extremely limited in her ability to bend and reach. Dr. Holliday opined that Plaintiff was unemployable for 12 months or more. (Tr. 420-21).[1]

In June 2005, Mark E. Jonas, M.D. reported that Plaintiff had multiple abdominal

---

[1] Even though the physician's name is not printed on this form, the parties agree that Dr. Holliday completed this form. *See* Doc. 12 at 11 and Doc. 16 at 6.

complaints with extensive negative work up, and a history of disc disease and it was unclear if that was contributing to her symptoms. He suspected that Plaintiff's symptoms were mostly functional in nature. (Tr. 460). Dr. Jonas noted, "Because of the disconnect between the extent of the patient's symptoms and the negative work up to date, I will check some additional esoteric studies including porphyria. (Tr. 460-61). There is no indication in the record that Dr. Jonas diagnosed anything specific.

In July 2005, Philip Swedberg, M.D. wrote a note on a prescription pad that Plaintiff was unable to work at that time due to chronic medical problems. (Tr. 419). The court cannot find any other treating records from this physician in the record.

In July 2005, Plaintiff was hospitalized for abdominal pain and diarrhea, and she was found to have a high white blood count. Antibiotics decreased both her pain and her white blood cell count. Surgery was not performed and the records do not reveal that the source of her pain was never discovered. (Tr. 422-58).

John Semertzides, M.D. suggested Plaintiff had a chronic urinary tract infection in July 2005. By September 2005, he recommended and performed additional surgery for adhesions. During surgery, Dr. Semertzides found an umbilical hernia and repaired it. (Tr. 468-76).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible

individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 416.920. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 416.925(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of

plaintiff's age, education, and work experience. 20 C.F.R. § 416.920(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 416.926(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 416.926(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole*

*v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a

whole. 20 C.F.R. § 416.927(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (Table), 1990 WL 94 (C.A.6 (Mich.)). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

## OPINION

Plaintiff assigns three errors in this case. First, plaintiff contends the ALJ erred in determining plaintiff's RFC. Second, plaintiff argues the ALJ erred at Step 5 in finding plaintiff could still perform " a significant number of jobs" in violation of SSR 00-4p. Third, plaintiff contends the ALJ erred in finding her testimony not credible. For the reasons that follow, the Court finds the decision of the ALJ is not supported by substantial evidence and should be reversed.

Plaintiff contends the ALJ should have accorded controlling weight to the opinion of Dr. Holliday, his treating family doctor, in determining plaintiff's RFC. Plaintiff was treated by Dr.

Holliday beginning January 2003 through at least October 2004. As discussed above, Dr. Holliday limited plaintiff's functional ability to less than sedentary work. (Tr. 420-21). The ALJ rejected Dr. Holliday's assessments as:

> As for the opinion evidence, in October, 2004 a physician opined the claimant cannot sit, stand, and/or walk in combination for 8 hours per day and is "unemployable." (Exhibit 18F). However, the description of medical conditions attached to the residual functional capacity assessment describes abdominal pain with "multiple CT scans of the abdomen and pelvis with no pathology seen," a diagnosis of fibromyalgia (which is never supported by a description of trigger points), depression (which is not treated, per claimant's admission), and goiter with subclinical hyperthyroidism. The physician notes "some concern for somatization disorder." None of these conditions would warrant a finding that the claimant cannot work. I give this opinion little weight.

(Tr. 22)

The Regulations require controlling weight to a treating physician's opinion only when it is both well supported by medically acceptable evidence and not inconsistent with other substantial evidence of record. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §416.927(d)(2). The ALJ applied these factors and determined that Dr. Holliday's opinion should be given "little weight" rather than controlling weight. This determination, standing alone, does not constitute reversible error. However, having determined that Dr. Holliday's opinion was entitled to "little weight" and that the opinions of Dr. Swedberg and the non-examining agency reviewers were entitled to "no weight," the ALJ erred by adopting an RFC that is not supported by substantial evidence.

Social Security Ruling 96-2p provides in relevant part:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," *not that the opinion should be rejected.* Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. *In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet*

14

*the test for controlling weight.* (emphasis added).

*See also* 20 C.F.R. § 416.927(d); *Wilson v. Commissioner*, 378 F.3d 541 (6th Cir. 2004). As explained by the Court in *Wilson,* "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (discussing 20 C.F. R. § 416.927(d)(2)). The ALJ must satisfy the clear procedural requirement of giving "good reasons" for discounting a treating physician's opinion, "reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion *and* the reasons for that weight.'" *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6thCir. 2007) (citing Social Security Ruling 96-2p, 1996 WL 374188, at *5) (emphasis added). *See also Wilson*, 378 F.3d at 544. The specific reasons requirement exists not only to enable claimants to understand the disposition of their cases, but to ensure "that the ALJ applies the treating physician rule and permit meaningful review of the ALJ's application of the rule." *Id.* Only where a treating doctor's opinion "is so patently deficient that the Commissioner could not possibly credit it" will the ALJ's failure to observe the requirements for assessing weight to a treating physician not warrant a reversal. *Id.* at 547.

The Court cannot say that Dr. Holliday's opinion "is so patently deficient that the Commissioner could not possibly credit it" to excuse the ALJ's failure in this case. Nor does the ALJ's decision make clear how he arrived at his RFC decision. The ALJ cited to no medical opinion which was contrary to Dr. Holliday's opinion, other than that of the non-examining agency reviewers. However, he gave no weight to their opinions. Thus it appears the ALJ adopted the lion's share of Dr. Holliday's RFC without explicitly so stating. Using Dr. Holliday's RFC, the ALJ appeared to pick and choose several of Dr. Holliday's restrictions to the exclusion of the others which, given the VE's testimony, would preclude all work activity.

15

For example, Dr. Holliday limited plaintiff to standing and walking for a total of 2 hours in an eight-hour day, 30 minutes without interruption. Sitting was limited to 2 hours in an 8 hour work day and lift eleven to twenty pounds occasionally and six to ten pounds frequently. (Tr. 421). The ALJ limited plaintiff to "She can lift/carry/push/pull up to 10 pounds occasionally and up to 5 pounds frequently. She can stand and/or walk up to 2 hours per 8-hour workday." (Tr. 20). With the exception of the lifting and sitting restrictions, these RFC assessments are similar. Yet, the ALJ failed to explain how he arrived at plaintiff's lifting or sitting limitations, and the Court is unable to discern from the record his method for doing so. Other than the opinion of the non-examining agency reviewers which the ALJ explicitly rejected, the record does not contain any additional medical evidence indicating that plaintiff can perform the lifting requirements identified by the ALJ in his RFC finding.

While the Court recognizes it is the ALJ's function to determine a plaintiff's RFC based on the record as a whole, the ALJ cannot substitute his "medical" opinion for that of a treating or examining doctor. *See Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985); *Sigler v. Secretary of Health and Human Servs.*, 892 F. Supp. 183, 187-88 (E.D. Mich. 1995). The ALJ must give some indication of the specific evidence relied upon and the findings associated with the limitations found in rendering his RFC decision. Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at his RFC determination. The Court simply cannot determine, on the state of the current record and the ALJ's decision, the underlying basis for the ALJ's RFC decision. Thus, the ALJ's reliance on the RFC for a range of less than sedentary work to find plaintiff is not disabled is in error.

In light of the above review, and the resulting need for remand of this case, an in-depth analysis of the remaining assignments of error is unwarranted.

This matter should be remanded for further proceedings, including a determination of the appropriate RFC. While the report of Dr. Holliday is strong evidence plaintiff cannot perform substantial gainful activity, such report was written over two years after plaintiff's alleged onset date of disability. Thus, the ALJ should address the issues of onset and duration on remand as well.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 5/20/09

Timothy S. Hogan
United States Magistrate Judge

17

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS REPORT & RECOMMENDATION

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

